[This opinion has been published in *Ohio Official Reports* at 80 Ohio St.3d 234.]

THE STATE OF OHIO, APPELLANT, *v.* ROBINETTE, APPELLEE.

**[Cite as *State v. Robinette* (1997), 80 Ohio St.3d 234.]**

*Criminal law—Motor vehicles—Continued detention of a person stopped for a traffic violation constitutes an illegal seizure, when—Totality-of-the-circumstances test is controlling in an unlawful detention to determine whether permission to search a vehicle is voluntary—Requirements for consent to be considered an independent act of free will.*

1. When a police officer's objective justification to continue detention of a person stopped for a traffic violation for the purpose of searching the person's vehicle is not related to the purpose of the original stop, and when that continued detention is not based on any articulable facts giving rise to a suspicion of some illegal activity justifying an extension of the detention, the continued detention to conduct a search constitutes an illegal seizure. (*State v. Robinette* [1995], 73 Ohio St.3d 650, 635 N.E.2d 695, paragraph one of the syllabus, modified.)

2. Under Section 14, Article I of the Ohio Constitution, the totality-of-the-circumstances test is controlling in an unlawful detention to determine whether permission to search a vehicle is voluntary. (*State v. Robinette* [1995], 73 Ohio St. 3d 650, 635 N.E.2d 695, paragraph two of the syllabus, vacated.)

3. Once an individual has been unlawfully detained by law enforcement, for his or her consent to be considered an independent act of free will, the totality of the circumstances must clearly demonstrate that a reasonable person would believe that he or she had the freedom to refuse to answer further questions and could in fact leave. (*Florida v. Royer* [1983], 460

U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229; *Schneckloth v. Bustamonte* [1973], 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854, followed.)

(No. 94-1143—Submitted June 11, 1997—Decided November 12, 1997.)

ON REMAND from the United States Supreme Court, No. 95-891.

_____

**{¶ 1}** In *State v. Robinette* (1995), 73 Ohio St.3d 650, 653 N.E.2d 695 ("*Robinette I*"), this court was faced with the following fact pattern:

"On August 3, 1992, appellee, Robert D. Robinette, was driving his car at sixty-nine miles per hour in a forty-five miles per hour construction zone on Interstate 70 in Montgomery County. Deputy Roger Newsome of the Montgomery County Sheriff's office, who was on drug interdiction patrol at the time, stopped Robinette for a speeding violation.

"Before Newsome approached Robinette's vehicle, he had decided to issue Robinette only a verbal warning, as was his routine practice regarding speeders in that particular construction zone. Newsome approached Robinette's vehicle and requested Robinette's driver's license. Robinette supplied the deputy with his driver's license, and Newsome returned to his vehicle to check it. Finding no violations, Newsome returned to Robinette's vehicle. At that point, Newsome had no intention of issuing Robinette a speeding ticket. Still, Newsome asked Robinette to get out of his car and step to the rear of the vehicle. Robinette complied with Newsome's request and stood between his car and the deputy's cruiser. Newsome returned to his vehicle in order to activate the cruiser's video camera so that he could videotape his interaction with Robinette. Newsome returned to Robinette, issued a verbal warning regarding Robinette's speed, and returned Robinette's driver's license.

"After returning the license, Newsome said to Robinette, 'One question before you get gone [*sic*]: are you carrying any illegal contraband in your car? Any weapons of any kind, drugs, anything like that?' Newsome testified that as part of

the drug interdiction project he routinely asked permission to search the cars he stopped for speeding violations. When Robinette said that he did not have any contraband in the car, Newsome asked if he could search the vehicle. Robinette testified that he was shocked at the question and 'automatically' answered 'yes' to the deputy's request. Robinette testified further that he did not believe that he was at liberty to refuse the deputy's request.

"Upon his search of Robinette's vehicle, Newsome found a small amount of marijuana. Newsome then put Robinette and his passenger in the back seat of the cruiser and continued the search. As a result of this extended search, Newsome found 'some sort of pill' inside a film container. The pill was determined to be methylenedioxy methamphetamine ('MDMA') and was the basis for Robinette's subsequent arrest and charge for a violation of R.C. 2925.11(A).

"Robinette's indictment was issued on December 18, 1992. On February 19, 1993, Robinette filed a motion to suppress the evidence found in the search of his vehicle. The trial court overruled the motion on March 8, 1993, finding that the deputy made clear to Robinette that the traffic matter was concluded before asking to search the vehicle. The court ruled that Robinette's consent did not result from any overbearing behavior on behalf of Newsome.

"Robinette appealed. The Court of Appeals for Montgomery County reversed the trial court, holding that Robinette remained detained when the deputy asked to search the car, and since the purpose of the traffic stop had been accomplished prior to that point, the continuing detention was unlawful and the ensuing consent was invalid." *Id.* at 651-652, 635 N.E.2d at 696-697.

{¶ 2} In *Robinette I* this court determined that the United States and Ohio Constitutions required that "[c]itizens stopped for traffic offenses be clearly informed by the detaining officer that they are free to go after a valid detention before an officer attempts to engage in a consensual interrogation. * * * " *Id.* at paragraph two of the syllabus.

**{¶ 3}** The state of Ohio appealed this ruling to the Supreme Court of the United States. The Supreme Court granted a writ of certiorari, 516 U.S. ___, 116 S.Ct. 1040, 134 L.Ed.2d 187, and issued its opinion in *Ohio v. Robinette* (1996), 519 U.S. ___, 117 S.Ct. 417, 136 L.Ed. 2d 347 ("*Robinette II*").

**{¶ 4}** The Supreme Court in *Robinette II* determined that it had jurisdiction to hear the appeal even though *Robinette I* rested upon the Ohio as well as the federal Constitution because *Robinette I* relied primarily upon federal law. *Id.* at ___, 117 S.Ct. at 420, 136 L.Ed.2d at 353. Where a state decision relies primarily upon or is intertwined with federal law, and the adequacy and independence of state law grounds are not clear from the face of the opinion, the United States Supreme Court has jurisdiction to review it. *Michigan v. Long* (1983), 463 U.S. 1032, 1040-1041, 103 S.Ct. 3469, 3472, 77 L. Ed.2d 1201, 1214.

**{¶ 5}** Although the state did not appeal the ruling in paragraph one of the syllabus in *Robinette I,* concerning the lawfulness of Robinette's continued detention after the license check, the court nevertheless determined that the issue of the legality of the detention was a "predicate to an intelligent resolution" of the question presented and proceeded to review the issue. *Robinette II* at ___, 117 S.Ct. at 420, 136 L.Ed.2d at 354. The court held that under *Whren v. United States* (1996), 517 U.S. ___, ___, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89, 98 (decided after *Robinette I*), the officer's subjective motivation in the detention of an individual is not material to the legality of the detention; the correct test is whether there was objective *justification* for the detention. *Robinette II* at ___, 117 S.Ct. at 420-421, 136 L.Ed.2d at 354. The court held that making Robinette get out of his vehicle was objectively justified under the Fourth Amendment because an officer may order an individual out of his or her vehicle pursuant to a lawful traffic stop. *Id.* at ___, 117 S.Ct. at 421, 136 L.Ed.2d at 354, citing *Pennsylvania v. Mimms* (1977), 434 U.S. 106, 111, 98 S.Ct. 330, 333, 54 L.Ed.2d 331, 337, fn. 6.

{¶ 6} The court then went on to consider whether the Fourth Amendment required an officer to state "you're free to go" or similar language prior to seeking permission to search a vehicle. The court held that the Fourth Amendment does not require such a statement. The court indicated that it has rejected other similar "bright-line" tests for determining whether a search is reasonable. See *Florida v. Bostick* (1991), 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389; *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854. Rather, the court concluded that the Fourth Amendment requires that the voluntariness of the search be determined by all the circumstances. *Robinette II*, 519 U.S. at ___, 117 S.Ct. at 421, 136 L.Ed.2d at 355, citing *Bustamonte* at 248-249, 93 S.Ct. at 2059, 36 L.Ed.2d at 875.

{¶ 7} As a result, the Supreme Court of the United States reversed this court's judgment in *Robinette I* and remanded the cause "for further proceedings, not inconsistent with this opinion." *Id.* at ___, 117 S.Ct. at 421, 136 L.Ed.2d at 355.

{¶ 8} Subsequent to the remand order by the United States Supreme Court, this court permitted the parties to brief the question "[w]hether this court's prior holding should be reaffirmed under the adequate and independent ground of the Constitution of the State of Ohio." See 78 Ohio St.3d 1412, 675 N.E.2d 1250.

{¶ 9} This matter is now before this court on remand from the United States Supreme Court.

---

*Mathias H. Heck, Jr.*, Montgomery County Prosecuting Attorney, and *Carley J. Ingram*, Assistant Prosecuting Attorney, for appellant.

*James D. Ruppert* and *Deborah A. Bailey*, for appellee.

*Betty D. Montgomery*, Attorney General, *Jeffrey Sutton*, State Solicitor, and *Simon B. Karas*, Deputy Chief Counsel, urging reversal for *amicus curiae*, Ohio Attorney General.

*W. Andrew Hasselbach* and *Margery Koosed,* urging affirmance for *amicus curiae*, Ohio Association of Criminal Defense Lawyers.

*Jeffrey M. Gamso* and *Joan M. Englund*, urging affirmance for *amicus curiae*, American Civil Liberties Union of Ohio Foundation, Inc.

_____

**LUNDBERG STRATTON, J.**

{¶ 10} The first issue that we must determine is whether this court's prior holding should be reaffirmed under the adequate and independent ground of the Constitution of the state of Ohio.

{¶ 11} When the United States Supreme Court incorporated the federal Bill of Rights into the Fourteenth Amendment, the United States Constitution became the primary mechanism to safeguard an individual's rights. See Principled Interpretations of State Constitutional Law: Why Don't the "Primacy" States Practice What They Preach? (1993), 54 U.Pitt.L.Rev. 1019, 1023-1024. As a result, state court litigation of constitutional issues was based primarily upon the authority of the United States Constitution. *Id.*; see, *e.g.*, *Mapp v. Ohio* (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (Fourth Amendment exclusionary rule applicable to states).

{¶ 12} However, more recently, there has been a trend for state courts to rely on their own constitutions to provide broader protection for individual rights, independent of protections afforded by the United States Constitution. See *Arnold v. Cleveland* (1993), 67 Ohio St.3d 35, 616 N.E.2d 163. A state may impose greater restrictions on police activity pursuant to its own state constitution than is required by federal constitutional standards. *California v. Greenwood* (1988), 486 U.S. 35, 43, 108 S.Ct. 1625, 1630, 100 L.Ed.2d 30, 39; *Oregon v. Hass* (1975), 420 U.S.

714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570, 575. This movement toward enforcing state constitutions independently has been called the "New Federalism."[1]

{¶ 13} Despite this wave of New Federalism, where the provisions are similar and no persuasive reason for a differing interpretation is presented, this court has determined that protections afforded by Ohio's Constitution are coextensive with those provided by the United States Constitution. See, *e.g., State v. Gustafson* (1996), 76 Ohio St.3d 425, 432, 668 N.E.2d 435, 441 (Double Jeopardy Clauses coextensive in their protections); *Eastwood Mall, Inc. v. Slanco* (1994), 68 Ohio St.3d 221, 222-223, 626 N.E.2d 59, 60 (First Amendment Free Speech Clauses coextensive in their protections).

{¶ 14} The language of Section 14, Article I of the Ohio Constitution and the Fourth Amendment is virtually identical.[2] Accordingly, this court has interpreted Section 14, Article I of the Ohio Constitution as affording the same protection as the Fourth Amendment. In *Nicholas v. Cleveland* (1932), 125 Ohio St. 474, 484, 182 N.E. 26, 30, fifth paragraph of the syllabus unrelated to the present case overruled by *State v. Lindway* (1936), 131 Ohio St. 166, 5 O.O. 538, 2 N.E.2d 490, this court, in comparing the Fourth Amendment and Section 14, Article I of the Ohio Constitution, stated:

---

1. See, *e.g., Commonwealth v. Edmunds* (1991), 526 Pa. 374, 390, 586 A.2d 887, 895, fn. 6.

2. Section 14, Article I of the Ohio Constitution provides:
   "The right of the people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the person and things to be seized."
   The Fourth Amendment to the United States Constitution states:
   "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

"While we are not bound by federal decisions upon this feature of the case, since the Bill of Rights in the Constitution of the United States is in almost the exact language of that found in our own, the reasoning of the United States court upon this aspect of the case should be very persuasive. The state courts, however, with practical unanimity, have adopted the same principle as the federal courts." See, also, *State ex rel. Wright v. Ohio Adult Parole Auth.* (1996), 75 Ohio St.3d 82, 661 N.E.2d 728.

{¶ 15} Perhaps most persuasively, this court in *State v. Geraldo* (1981), 68 Ohio St.2d 120, 125-126, 22 O.O.3d 366, 369-370, 429 N.E.2d 141, 145-146, stated:

"The question is whether this court should imbue the state constitutional provisions regarding search and seizure with a more stringent standard of reasonableness than is required by the cognate federal constitutional provisions. * * * [W]e are disinclined to impose greater restrictions in the absence of explicit state constitutional guarantees protecting against invasions of privacy that clearly transcend the Fourth Amendment. * * * It is our opinion that the reach of Section 14, Article I, of the Ohio Constitution * * * is coextensive with that of the Fourth Amendment." See, also, *State v. Andrews* (1991), 57 Ohio St.3d 86, 87, 565 N.E.2d 1271, 1273, fn. 1.

{¶ 16} Thus, case law indicates that, consistent with *Robinette II*, we should harmonize our interpretation of Section 14, Article I of the Ohio Constitution with the Fourth Amendment, unless there are persuasive reasons to find otherwise.

{¶ 17} We will first determine whether Robinette's stop and continued detention were justified. It is undisputed that Officer Newsome's act of stopping Robinette was justified because Robinette was speeding. We also find that Newsome's instruction for Robinette to exit the vehicle was also justified because it was a traffic stop. *Pennsylvania v. Mimms* (1977), 434 U.S. 106, 111, 98 S.Ct.

8

330, 333, 54 L.Ed.2d 331, 337, fn. 6. Once Newsome administered the warning for speeding to Robinette, the reason for the stop ended.

{¶ 18} However, Newsome continued to detain Robinette pursuant to a drug interdiction policy. The drug interdiction policy required police officers to ask persons detained during a traffic stop whether they had any contraband and then to ask to search the vehicle.

{¶ 19} We note here that, pursuant to *Whren v. United States* (1996), 517 U.S. ___, 116 S.Ct. 1769, 135 L.Ed.2d 89, the officers' subjective motivation for continuing the detention is irrelevant. *Whren*, decided after our decision in *Robinette I*, held that as long as the circumstances objectively justify the continued stop, the Fourth Amendment is not offended. We therefore modify paragraph one of the syllabus in *Robinette I* to read as follows:

"When a police officer's objective *justification* to continue detention of a person stopped for a traffic violation for the purpose of searching the person's vehicle is not related to the purpose of the original stop, and when that continued detention is not based on any articulable facts giving rise to a suspicion of some illegal activity justifying an extension of the detention, the continued detention to conduct a search constitutes an illegal seizure."

{¶ 20} And so the question becomes, was Officer Newsome objectively justified, under the circumstances, in detaining Robinette after administering the verbal warning? Specifically, we must first determine whether the officer was justified in detaining Robinette to ask him whether he had any contraband.

{¶ 21} In *Florida v. Royer* (1983), 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229, the Supreme Court held that the minimal intrusion of simple questioning of a person not in custody does *not* constitute a "seizure" requiring Fourth Amendment protection. Specifically, the court in *Royer* stated:

"[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking

him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Id.* at 497, 103 S.Ct. at 1324, 75 L.Ed.2d at 236.

"The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." (Citations omitted.) *Id*. at 497-498, 103 S.Ct. at 1324, 75 L.Ed.2d 236.

{¶ 22} The *Royer* court held that where the public interest in law enforcement warrants a detention on less than probable cause, the stop must be *temporary* and the investigative methods must employ the *least intrusive means* available. *Id.* at 500, 103 S.Ct. at 1325, 75 L.Ed.2d at 238. The suppression of illegal drug trafficking is such a public interest. *Id.* at 498-499, 103 S.Ct. at 1324, 75 L.Ed.2d at 237.

{¶ 23} In a similar context, the United States Supreme Court has determined that sobriety checkpoints are constitutional if the initial intrusion and detention are minimal and the detention serves the public interest. The test was set out in *Brown v. Texas* (1979), 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357, wherein the court weighed "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Id.* at 51, 99 S.Ct. at 2640, 61 L.Ed.2d at 362.

{¶ 24} In sum, *Royer* and *Brown* set out a standard whereby police officers, under certain circumstances, may briefly detain an individual without reasonably articulable facts giving rise to suspicion of criminal activity, if the detention promotes a legitimate public concern, *e.g.,* removing drunk drivers from public roadways or reducing drug trade.

**{¶ 25}** In the case at bar, we find that, pursuant to *Royer* and *Brown,* Officer Newsome was justified in briefly detaining Robinette in order to ask him whether he was carrying any illegal drugs or weapons pursuant to the drug interdiction policy, because such a policy promotes the public interest in quelling the drug trade.

**{¶ 26}** The next issue for our determination is whether the continued detention of Robinette after this point was lawful.

**{¶ 27}** If during the initial detention to ask the contraband question, the officer ascertained reasonably articulable facts giving rise to a suspicion of criminal activity, the officer may then further detain and implement a more in-depth investigation of the individual. For example, at a sobriety checkpoint an officer who detects slurred speech would be justified in detaining the individual to perform a field test. *State v. Eggleston* (1996), 109 Ohio App.3d 217, 671 N.E.2d 1325.

**{¶ 28}** In the case at bar, Newsome did not have any reasonably articulable facts or individualized suspicion to justify Robinette's further detention in order to ask to search his car. The facts here are similar to those in *Royer* where police were held to be justified in briefly questioning Royer, but when they further detained him, without probable cause, to gain his consent to search his luggage, the United States Supreme Court ruled that this further detention was unlawful.

**{¶ 29}** Accordingly, Newsome was not justified in detaining Robinette in order to ask for and execute an intrusive search. See *Henry v. United States* (1959), 361 U.S. 98, 102-104, 80 S.Ct. 168, 171-172, 4 L.Ed.2d 134, 138-139; *Terry v. Ohio* (1968), 392 U.S. 1, 21, 88 S.Ct. 1868, 1879-1880, 20 L.Ed.2d 889, 906.

**{¶ 30}** Even though we have determined that Newsome unlawfully detained Robinette to ask for permission to search his car, our analysis is not complete. Voluntary consent, determined under the totality of the circumstances, may validate an otherwise illegal detention and search. *Davis v. United States* (1946), 328 U.S. 582, 593-594, 66 S.Ct. 1256, 1261-1262, 90 L.Ed.2d 1453, 1460-1461.

**{¶ 31}** Robinette argues that retention of *Robinette I*'s "free to go" rule would provide predictability in determining whether an individual consented to a search. We find that Robinette's conclusion is based on an oversimplified approach to the issue of consent. In *Bustamonte, supra,* the court recognized that consent searches are part of the standard investigatory techniques of law enforcement agencies. *Id.*, 412 U.S. at 231-232, 93 S.Ct. at 2050, 36 L.Ed.2d at 865. The court, in refusing to adopt a requirement that an officer would have to advise the individual that he or she had a right to refuse to consent to a search, stated, "[I]t would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning." *Id.* at 231, 93 S.Ct. at 2050, 36 L.Ed.2d at 865. In also declining to adopt a "waiver" statement that police officers could read to a person whom they wish to ask to search (*i.e.*, a standard requiring that a consent to search is valid only if it is an intentional relinquishment of a known right), the court in *Bustamonte* further stated:

"It would be unrealistic to expect that in the informal, unstructured context of a consent search, a policeman, upon pain of tainting the evidence obtained, could make the detailed type of examination demanded by *Johnson* [*v. Zerbst* (1938), 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, concerning waiver of counsel in criminal case]. And, if for this reason a diluted form of 'waiver' were found acceptable, that would itself be ample recognition of the fact that there is no universal standard that must be applied in every situation where a person forgoes a constitutional right." *Bustamonte,* 412 U.S. at 245, 93 S.Ct. at 2057, 36 L.Ed.2d at 873.[3]

---

3. Because circumstances so vary, the United States Supreme Court in *Johnson v. Zerbst* (1938), 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, reasoned:

"The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Id.* at 464, 58 S.Ct. at 1023, 82 L.Ed. at 1466.

**{¶ 32}** In sum, every search situation is unique unto itself and no set of fixed rules will be sufficient to cover every situation.[4] For that reason, *Bustamonte* utilized the totality-of-the-circumstances test to determine when consent is voluntary. Such a test serves both interests of allowing police to legitimately investigate under varying circumstances while protecting individuals from unreasonable searches and seizures. *Id.* at 225, 93 S.Ct. at 2046, 36 L.Ed.2d at 861.

**{¶ 33}** We find *Bustamonte* instructive in defining when permission to search is truly consensual under the totality of the circumstances:

"[W]hen the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." *Id.,* 412 U.S. at 248-249, 93 S.Ct. at 2059, 36 L.Ed.2d at 875.

**{¶ 34}** In *Royer*, the court further defined the elements of voluntary consent. In *Royer*, narcotics agents stopped the defendant at an airport solely because he fit a drug courier profile and escorted him to a separate room. Royer's luggage was retrieved from the airline without his consent. When the agents asked for consent to search his luggage, Royer did not respond verbally, but produced a key and unlocked his suitcase. A detective, without further authorization from

---

4. For example, evidence could show that a defendant had been advised by his attorney after a previous arrest that he did not have to consent to such a search and to absolutely refuse in the future. If the officer fails to use the magic words and consent is given (because the defendant did not believe the officer could find the hidden drugs), the search could be thrown out on a technicality even though the proof under the totality-of-the-circumstances test would establish that the consent was freely given.

Royer, then opened the suitcase. Marijuana was inside. In finding the detention unlawful, the United States Supreme Court held:

"[I]t is unquestioned that without a warrant to search Royer's luggage and in the absence of probable cause and exigent circumstances, the validity of the search depended on Royer's purported consent. Neither is it disputed that where the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was *freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority.*" (Emphasis added.) *Id.*, 460 U.S. at 497, 103 S.Ct. at 1323-1324, 75 L.Ed.2d at 236.

{¶ 35} In the case at bar, Officer Newsome stopped Robinette for driving sixty-nine miles per hour in a forty-five-mile-per-hour construction zone. Officer Newsome asked Robinette to step to the rear of his (Robinette's) car, which was in front of the patrol car. Newsome returned to his patrol car and turned on a video camera. Newsome gave Robinette a verbal warning *and advised Robinette that he was letting him off with only a verbal warning. But without any break in the conversation* and still in front of the camera, Newsome then asked Robinette, "One question before you get gone [*sic*]: are you carrying any illegal contraband in your car? Any weapons of any kind, drugs, anything like that?" Robinette denied having any contraband in the car. Newsome then immediately asked Robinette if he could search the car. Robinette hesitated, looked at his car, then back at the officer, then nodded his head. Newsome commenced a lengthy search of Robinette's car. During the search Newsome recovered some marijuana and a pill. Robinette was charged with drug abuse.

{¶ 36} At the suppression hearing, Robinette provided the following testimony pertaining to the search:

"Q      And did he [Newsome] indicate to you that at that time [when he returned from activating the video camera] that he was giving you a warning and that you were free to go?

"A      Yes, he did.

"Q      And then at that time, I think, as the tape will reflect, the officer asked you some questions about did you have any weapons of any kind, drugs, anything like that.  Do you recall that question?

"A      Yes.

"* * *

"Q      Did you in fact feel that you were free to leave at that point?

"A      I thought I was.

"* * *

"Q      The officer then asked if he could search your vehicle.  What went through your mind at that point in time?

"A      Uhm, I was still sort of shocked and I — I thought — I just automatically said yes.

"Q      Did — did you feel that you could refuse the officer?

"A      No."

{¶ 37} Newsome's words did not give Robinette any indication that he was free to go, but rather implied just the opposite — that Robinette was *not* free to go until he answered Newsome's additional questions.  The timing of Newsome's immediate transition from giving Robinette the warning for speeding into questioning regarding contraband and the request to search is troubling.  As the majority stated in *Robinette I*:

"The transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred.  The undetectability of that transition may be used by police officers to coerce citizens into answering questions that they need not answer, or to allow a search of a vehicle

that they are not legally obligated to allow." *Id*., 73 Ohio St.3d at 654, 653 N.E.2d at 698.[5]

**{¶ 38}** When these factors are combined with a police officer's superior position of authority, any reasonable person would have felt compelled to submit to the officer's questioning. While Newsome's questioning was not expressly coercive, the circumstances surrounding the request to search made the questioning impliedly coercive. Even the state conceded, at an oral argument before the United States Supreme Court, that an officer has discretion to issue a ticket rather than a warning to a motorist if the motorist becomes uncooperative. See 1996 WL 587659, at 5 (Official Transcript of Oral Argument). From the totality of the circumstances, it appears that Robinette merely submitted to "a claim of lawful authority" rather than consenting as a voluntary act of free will. Under *Royer,* this is not sufficient to prove voluntary compliance. *Royer*, 460 U.S. at 497, 103 S.Ct. at 1324, 75 L.Ed.2d at 236.

**{¶ 39}** We are very mindful that police officers face the enormous and difficult task of fighting crime. Furthermore, we explicitly continue to recognize that officers may conduct checkpoint-type questioning and consensual searches, and may progress to further detention and investigation when individualized suspicion of criminal activity arises during questioning based on reasonably articulable facts. But allowing police officers to do their jobs must be balanced against an individual's right to be free from unreasonable searches. At some point, individual rights must prevail. This is just such a case.

---

5. This transition was so seamless that even the *amicus* brief filed by the Ohio Attorney General missed the transition. In that brief, the Attorney General states, "Even though Robinette took the stand and admitted under oath that he felt he was 'free to leave' when the officer asked for consent to search his car, the fruits of that search were suppressed." Yet, Robinette clearly testified that he felt he was free to go while he was being questioned, but when Newsome asked to search his vehicle he no longer felt free to go.

**{¶ 40}** Accordingly, we find that Section 14, Article I of the Ohio Constitution affords protections that are coextensive with those provided by the Fourth Amendment and, therefore, the Ohio Constitution does not require a police officer to inform an individual, stopped for a traffic violation, that he or she is free to go before the officer may attempt to engage in a consensual interrogation. Further, under Section 14, Article I of the Ohio Constitution, we find that the totality-of-the circumstances test is controlling in an unlawful detention to determine whether permission to search a vehicle is voluntary. Once an individual has been unlawfully detained by law enforcement, for his or her consent to be considered an independent act of free will, the totality of the circumstances must clearly demonstrate that a reasonable person would believe that he or she had the freedom to refuse to answer further questions and could in fact leave.[6] *Bustamonte, supra; Royer, supra; State v. Barnes* (1986), 25 Ohio St.3d 203, 208-209, 25 OBR 266, 270-271, 495 N.E.2d 922, 926.

**{¶ 41}** Therefore, pursuant to the totality of the circumstances, we find that Robinette did not voluntarily consent to allow Newsome to search his automobile.

---

6. If police wish to pursue a policy of searching vehicles without probable cause or reasonably articulable facts, the police should ensure that the detainee knows that he or she is free to refuse consent despite the officer's request to search or risk that any fruits of any such search might be suppressed. While we are not mandating any bright-line test or magic words, when a police officer informs a detainee that he or she does not have to answer further questions and is free to leave, that action would weigh persuasively in favor of the voluntariness of the consent to search. As noted in the *amicus* brief of Americans for Effective Law Enforcement filed with the United States Supreme Court:

"Such a warning may be good police practice, and indeed amicus knows that many law enforcement agencies among our constituents have routinely incorporated a warning into their Fourth Amendment consent forms that they use in the field, but is precisely that — a practice and not a constitutional imperative. An officer who includes such a warning in his request for consent undoubtedly presents a stronger case for a finding of voluntariness in a suppression hearing, and we would not suggest that such agencies and officers do otherwise. We know, too, that instructors in many police training programs of leading universities and management institutes routinely recommend such warnings as a sound practice, likely to bolster the voluntariness of a consent to search. [We ourselves] conduct[] law enforcement training programs at the national level and many of our own speakers have made this very point."

As a result, the evidence collected in that search is inadmissible. The judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., RESNICK and PFEIFER, JJ., concur.

COOK, J., concurs in judgment only.

DOUGLAS and F.E. SWEENEY, JJ., dissent.

————————————

**COOK, J., concurring in judgment only.**

{¶ 42} The majority concludes that the fruits of the consent search of Robinette's vehicle were (1) the product of an illegal detention and (2) obtained as a result of Robinette's involuntary consent. I agree only that the fruits of the search were the product of an illegal detention. I nevertheless concur because evidence gathered by police during an illegal detention is inadmissible, even where consent to search has been voluntarily given, unless the state proves that the consent resulted from an independent act of free will. *Florida v. Royer* (1983), 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229. Additionally, I write to clarify some fine distinctions that seem blurred by the majority.

SEIZURE OF ROBINETTE

{¶ 43} In order for there to be an illegal detention there must be a seizure of the person that is unreasonable. In determining whether there is a seizure, a court must take into account the circumstances surrounding the encounter and determine whether the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business. *Michigan v. Chesternut* (1988), 486 U.S. 567, 569, 108 S.Ct. 1975, 1977, 100 L.Ed.2d 565, 569. Here, the majority applies this test to adjudge that Officer Newsome continued to "seize" Robinette, within the meaning of the Fourth Amendment, after concluding his investigative purpose for the initial stop.

REASONABLENESS OF THE SEIZURE

**{¶ 44}** After determining that Officer Newsome's extended detention of Robinette constituted a seizure, the majority nevertheless concludes that the first question asked in connection with a drug interdiction policy—whether Robinette possessed any contraband—did not violate the Fourth Amendment. In support of that conclusion, the majority cites two portions of the United States Supreme Court's plurality opinion in *Florida v. Royer, supra,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229, and the test set out in *Brown v. Texas* (1979), 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357.

**{¶ 45}** In its first reference to *Royer*, the majority quotes language addressing situations where a police encounter does not rise to the level of a seizure. The second cite to *Royer* addresses situations where there has, in fact, been a seizure, but that seizure is justified by a police officer's reasonable suspicion of criminal activity. In light of the majority's determinations that Robinette was seized while being questioned pursuant to the drug interdiction policy and that Officer Newsome did not possess a reasonable suspicion justifying that detention, the *Royer* citations lend no support to the majority's analysis. The majority's cite to *Brown*, on the other hand, does relate to situations where police, absent even a reasonable suspicion of criminal activity, may seize individuals without violating the Fourth Amendment (*e.g.,* sobriety checkpoints).

**{¶ 46}** As noted in *Brown* at 51, 99 S.Ct. at 2640, 61 L.Ed.2d at 362, a seizure may be reasonable within the confines of the Fourth Amendment despite the absence of probable cause or reasonable suspicion of criminal activity if the seizure satisfies a balance between " 'the public interest and the individual's right to personal security free from arbitrary interference by law officers.' " *Id.*, 443 U.S. at 50, 99 S.Ct. at 2640, 61 L.Ed.2d at 361, quoting *Pennsylvania v. Mimms* (1977), 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331, 336. The United States Supreme Court has applied this standard to determine that fixed border patrol

checkpoints (*United States v. Martinez-Fuerte* [1976], 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116) and sobriety checkpoints (*Michigan Dept. of State Police v. Sitz* [1990], 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412) are not unreasonable seizures within the meaning of the Fourth Amendment if "carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *Brown*, 443 U.S. at 51, 99 S.Ct. at 2640, 61 L.Ed.2d at 362.

{¶ 47} In light of these cases, analysis of Officer Newsome's inquiry during the extended detention, as part of a drug interdiction policy, would pose an interesting legal question. As noted by the majority, suppression of illegal drug trafficking weighs heavily in the public interest. Additionally, that Officer Newsome's questioning followed a valid initial stop and was limited to two brief questions minimizes the seizure's interference with individual liberty.[7] Had the state advanced Officer Newsome's extended detention of Robinette as a reasonable seizure under the Fourth Amendment pursuant to the drug interdiction policy, rather than arguing that there was no seizure at all, it might have been able to demonstrate that there was no period of illegal detention and thus no Fourth Amendment violation. The state, however, did not pursue this line of reasoning and, consequently, did not introduce evidence sufficiently demonstrating that the drug interdiction policy met the standards for neutrality set forth in *Martinez-Fuerte* and *Sitz.* Accordingly, I conclude that both questions posed to Robinette after the initial stop had ended constituted illegal detention and that the evidence seized flowing from the later consent search was therefore inadmissible. Compare *State v. Chatton* (1984), 11 Ohio St.3d 59, 11 OBR 250, 463 N.E.2d 1237.

---

7. For purposes of this inquiry, the period of detention attributable to the drug interdiction policy would exclude the search conducted by Officer Newsome after he obtained Robinette's consent. "The Fourth Amendment proscribes unreason-able searches and seizures; it does not proscribe voluntary cooperation." *Florida v. Bostick* (1991), 501 U.S. 429, 439, 111 S.Ct. 2382, 2389, 115 L.Ed.2d 389, 401. It would also exclude the period of detention attributable to the initial stop. *Pennsylvania v. Mimms* (1977), 434 U.S. 106, 111, 98 S.Ct. 330, 333, 54 L.Ed.2d 331, 337.

## PROPER DEFERENCE SHOULD BE GIVEN TO THE
## TRIAL COURT'S FACTUAL FINDINGS

{¶ 48} A determination that evidence seized by police is the product of an illegal detention ordinarily obviates the need for a court to determine whether consent to search was, in fact, voluntarily given. *Royer,* 460 U.S. at 501, 103 S.Ct. at 1326, 75 L.Ed.2d at 238. The evidence is to be suppressed unless the state can demonstrate that consent to the search was given by the defendant as an *independent act* of free will. *Id.* No such showing was made by the state in this case. Accordingly, this court's analysis should end at its determination that consent to search was the product of the illegal detention.

{¶ 49} The majority, nonetheless, reviews the trial court's factual finding that consent was voluntarily given. In reversing the trial court's finding of voluntariness, the majority does not defer to the trial court as the trier of fact. The question of whether consent is voluntarily given, unlike the inquiry into whether a police encounter constitutes a seizure, however, is a pure question of fact, requiring the trier of fact to determine what the defendant subjectively believed. Compare *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 227, 93 S.Ct. 2041, 2047-2048, 36 L.Ed.2d 854, 862 ("question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances"), with *Chesternut*, *supra,* 486 U.S. at 574, 108 S.Ct. at 1980, 100 L.Ed.2d at 572 (" 'reasonable person' standard [used to determine whether a seizure has occurred] ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached").

"At a suppression hearing, the evaluation of evidence and the credibility of witnesses are issues for the trier of fact." *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972, 982. In cases such as this, where there are two reasonable views of the evidence, an appellate court is not free to choose the view that it

prefers. Instead, the appellate court must yield to the trier of fact, who "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 411, 461 N.E.2d 1273, 1276.

## CONCLUSION

{¶ 50} Although I disagree with much of the majority's analysis, I concur in its disposition of this case based solely on the state's failure to demonstrate that Robinette's consent was procured during a period of legal detention. The state carries the burden of proving that a warrantless search or seizure is constitutionally permissible. *Xenia v. Wallace* (1988), 37 Ohio St.3d 216, 524 N.E.2d 889, paragraph two of the syllabus. In this case, the state failed to meet that burden.

_____

**FRANCIS E. SWEENEY, SR., J., dissenting.**

{¶ 51} In *State v. Robinette* (1995), 73 Ohio St.3d 650, 653 N.E.2d 695, I rejected the majority's "bright line" test, which required police officers to recite certain words before instituting a consensual interrogation. Instead, I stated that the correct test to be applied is the totality-of-the-circumstances test, which takes into consideration all of the circumstances surrounding the encounter. *Id.* at 655-658, 653 N.E.2d at 699-701 (F.E. Sweeney, J., dissenting). The United States Supreme Court also eschewed the bright-line test and stated that voluntariness is a question of fact to be determined from all the circumstances. *Ohio v. Robinette* (1996), 519 U.S. ___, ___, 117 S.Ct. 417, 421, 136 L.Ed.2d 347, 355. The Supreme Court reversed the judgment and remanded the cause to this court. Upon remand, the majority now applies the correct test (totality of the circumstances), but, in my opinion, still reaches the wrong result.

{¶ 52} Based upon the testimony presented, it is clear that Robinette consented to the search of his vehicle. Robinette specifically stated that he thought

he was free to leave at the time the police officer asked whether he could search the vehicle. Robinette conceded that the police officer was nice to him during the encounter and acted in a nonthreatening manner. Based upon these facts, I am unwilling to hold that Robinette "merely submitted to 'a claim of lawful authority'" as the majority concludes. Instead, under the totality of the circumstances, I believe that there was no coercion and that Robinette voluntarily consented to the search of the vehicle.

{¶ 53} Accordingly, I would reverse the judgment of the court of appeals and reinstate the trial court's judgment.

DOUGLAS, J., concurs in the foregoing dissenting opinion.

———————————